DANIEL (WHARTENBY v.). See Case No. 17.479.

DANIEL AUGUSTA. The (MILBOURNE v.). See Case No. 9,540.

## Case No. 3,564.

### The DANIEL BALL.

[1 Brown, Adm. (1876) 193.] [1]

#### District Court, W. D. Michigan.

NAVIGABLE WATERS — POWER TO REGULATE COMMERCE BETWEEN DIFFERENT STATES — TO WHAT VESSELS INSPECTION LAWS ARE APPLICABLE.

A small steamer was engaged in transporting freight and passengers upon Grand river, be-

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

tween Grand Rapids and Grand Haven, in the state of Michigan. Although her route was wholly within the state, she carried freight consigned to and from other states, which was transhipped at Grand Haven. She also carried passengers on their way to and from Chicago and Milwaukee. In the opinion of the court, she was subject to inspection and license under the navigation laws of the United States, but as a different view of the law had been taken in the same and other districts: Held, out of deference to these opinions, and for the sake of uniformity, the libel should be dismissed.

The steamer Daniel Ball was libelled for want of inspection and license under the navigation laws. The owners set up by way of defense that the Ball was not, by law, required to be inspected or licensed. The facts agreed upon were as follows: The Ball was a steamer of 123 tons burden, drawing about two feet of water, running on Grand river, a river entirely within the state of Michigan. She was so constructed as to be incapable of navigating the waters of Lake Michigan, or of continuing her voyage further than Grand Haven, a port on Lake Michigan, at the mouth of Grand river. She took in freight at Grand Rapids, forty miles up the river, and received and delivered at other places along the river. At Grand Haven her cargo, not previously discharged, was unloaded. A part of her freight was goods and merchandise shipped from Grand Rapids, and destined to places in other states, viz.: Chicago and Milwaukee, in Illinois and Wisconsin; but such goods were delivered at Grand Haven, to warehouse and forwarding agents, to whom they were consigned at that port, who forwarded such goods to their place of destination in other states by lake boats. Passengers were carried by the Ball who were on their way to Chicago and Milwaukee. The second section of the act of congress of July 7, 1838 [5 Stat. 304], provides, "that it shall not be lawful for the owner, master, or captain, of any steamboat, * * * to transport any goods, wares and merchandise, or passengers, in or upon the bays, lakes, rivers, or other navigable waters of the United States, * * * without having first obtained a license," etc. The owner incurs the penalty of $500 for a violation of this section, and the boat is liable to be proceeded against to enforce the forfeiture against her. The act requires all such steamers to be inspected annually. The amendatory act of August 30, 1852 [10 Stat. 61], provides, "that no license, register or enrollment, under the provisions of this or the act to which this is an amendment, shall be granted, or other papers issued by any collector, to any vessel, propelled in whole or in part by steam, and carrying passengers, until he shall have satisfactory evidence that all the provisions of this act have been fully complied with; and if any such vessel shall be navigated with passengers on board, without complying with the terms of this act, the owner thereof, and the vessel itself, shall be subject to

the penalties contained in the second section of the act to which this is an amendment." This act further provides for the inspection of the hulls of steamers, and of their boilers, engines, etc. On the part of the owners, it was claimed that the act, in terms, goes beyond the constitutional powers of congress to legislate, inasmuch as it includes boats navigating only the internal waters of a state, which do not transport goods or passengers between two or more states. The constitutional provision under which the navigation law in question is passed, is as follows: "Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

E. S. Eggleston, Dist. Atty., for the United States.

John S. Newberry, for claimant.

WITHEY, District Judge. It has been repeatedly held by the courts of the United States that a commerce which is purely internal, carried on entirely within a state, and which does not affect other states, is not within the power of congress under the constitution to regulate, but belongs exclusively to the state. Commerce is defined to be "an exchange of commodities;" it is "trade and traffic," and "includes navigation and intercourse." The power to regulate commerce, then, includes the power to regulate navigation; but the navigation, like the commodity which is transported for exchange, trade and traffic, must be such as is embraced within and is a part of the commerce among the states. We are brought to the single question, therefore, whether the navigation in which the Ball was engaged on Grand river, carrying goods and passengers exclusively within the state of Michigan but which were shipped for places in other states, is "commerce among the several states." If this question was now presented and to be decided for the first time, I should have no hesitation, from the consideration I have given it, in holding the Ball to be employed in commerce between the states, and liable for the penalty of $500.

The first authority which I notice is the decision, in manuscript, by Judge Wilkins, pronounced in 1856 or 1857, in two cases. The Forest Queen and the Pontiac were running on Grand river, which was then within the jurisdiction of what is now the eastern district court. Goods and passengers were conveyed on these river boats to Grand Haven, and there transhipped, destined and shipped from inland towns on the river to other states; and goods and passengers coming from other states across the lakes were landed at the mouth of Grand river in Michigan, and there transhipped and conveyed to places in the interior of the state by the Queen and Pontiac. The learned judge says: "The commerce stopped at Grand Haven, so far as

the lake vessels were concerned, and the subsequent instrumentality of Grand river in the business was not such as to constitute this upward, new and interior state navigation, a commerce between Michigan, as to that trade, and other states." Again, "This commerce, then, was altogether internal, and subject only to the control and government of the state of Michigan, and is not within either the letter or spirit of the constitution." That case is the only one where the precise question has been before a court and decided, so far as I can discover, that is involved in the case at bar. The following cases cited at the bar are not regarded as presenting the question I am considering, for the reason that in none of them do the facts disclosed show that goods were being conveyed which had been shipped from one state to another: U. S. v. The Seneca [Case No. 16,251]; Brooks v. The Peytona [Id. 1,959]; Whitaker v. The Fred. Lorents [Id. 17,527]; U. S. v. The William Pope [Id. 16,703]; U. S. v. The James Morrison [Id. 15,465]; U. S. v. The W. K. Muir and The Davidson [Id. 16,749]; U. S. v. The S. K. Kirby [Id. 16,310]. The steam ferry Pope, was a ferry-boat across the Missouri, at St. Louis, and it was held that in no proper sense could the Pope be said to be engaged in any trade, or be employed in the coasting trade. "A ferry I deem nothing but a continuation of a road." "I admit," says the judge, "that congress might, constitutionally, regulate the transit on roads and over ferries, so far as it is necessary to regulate the commerce with foreign nations, among the several states and with the Indian tribes, but no farther." In The James Morrison [supra], the same judge discusses the question involved in the case at bar, though not involved in that case, and the argument is an able one in support of the views I have suggested. In that case, the judge says: "The coasting trade is a part of the commerce among the several states, and it is not the less a part of that commerce because the vessel navigates only from port to port in the same state, up and down a navigable river of the United States, and never goes beyond the state boundary."

I have examined, with care, the other cases referred to and commented upon by the counsel for the owners, viz.: Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1; Wilson v. Black Bird Creek Marsh Co., 2 Pet. [27 U. S.] 245; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344; Passenger Cases, 7 How. [48 U. S.] 283; Veazie v. Moor, 14 How. [55 U. S.] 568; Allen v. Newberry, 21 How. [62 U. S.] 244; Maguire v. Card, Id. 248. I am unable to discover that any or all of these cases support the view taken by the defense. The case of Wilson v. Black Bird Creek Co., 2 Pet. [27 U. S.] 245, was referred to as authority that Grand river is not a navigable water of the United States, and is cited by Judge Wilkins in The Forest Queen and The Pontiac as conclusive authority on that ques-

tion. I do not understand the opinion of Judge Marshall, in this case, to go so far as is claimed. On the contrary, I regard it to be the well settled doctrine of the supreme court of the United States, that all waters within the United States which are navigable for the purpose of commerce, or in other words, waters whose navigation successfully aids commerce, are waters of the United States, and in the late case of Hine v. Trevor, 4 Wall. [71 U. S.] 555, it was decided that the admiralty jurisdiction of the United States "extends wherever ships float and navigation successfully aids commerce, whether internal or external." That Grand river successfully aids commerce I need not discuss; vessels from Chicago and other lake ports can navigate for miles up this river, and steamers run daily forty miles up its stream. If, then, admiralty jurisdiction may be exercised in a case arising on Grand river, it must be a navigable water of the United States.

In the leading case touching the power of congress under the constitution to regulate commerce, of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, decided by the supreme court in 1824, at page 194, Chief Justice Marshall says: "The subject to which the power is next applied is to commerce among the several states. The word 'among' means intermingled with. A thing which is among others is intermingled with them. Commerce among the states cannot stop at the external boundary line of each state, but may be introduced into the interior. It is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. Comprehensive as the term 'among' is, it may very properly be restricted to that commerce which concerns more states than one." Was not the merchandise transported on the steamer Ball, shipped and destined for other states, a commerce which affected more states than one? Was it a commerce completely internal, carried on between man and man in a state, or between different parts of the same state, and not extended to or affecting other states?—as it would have been if it were to have stopped at Grand Haven, and not to go on from thence to other states. The carriage between Grand Rapids and Grand Haven was internal, but the commodity carried was proceeding to another state, and such other state, as well as Michigan, was interested in the trade and traffic of that commodity from the time it left Grand Rapids. As an article of export from the latter and of import to the former, both states were interested in the traffic, trade or exchange of that commodity; hence it was commerce among the states. The means used in transporting that commodity was navigation, which is included in commerce. At page 197 of the same case the court says: "The power of congress, then,

comprehends navigation within the limits of every state in the Union, so far as that navigation may be in any manner connected with commerce with foreign nations, or among the several states, or with the Indian tribes." Thus it would appear that the power of congress to regulate commerce with foreign nations, or among the several states, is co-extensive with the subject itself, and touches and controls both the commodity and the means employed in the conveyance at every step, from the point of shipment to the place of destination, in different states. At page 204, the court further says: "If congress license vessels to sail from one port to another in the same state, the act is supposed to be, necessarily, incidental to the power expressly granted to congress, and implies no claim of a direct power to regulate the purely internal commerce of a state, or to act directly on its system of police."

Clearly, here is an intimation of a power in congress to require of vessels employed in the coasting trade, exclusively from point to point in the same state, to take a license, and it must be upon the ground that such vessels carry commodities which are in transit from a place in one state to a place in another, and therefore engaged in commerce among the states. In none of the other cases referred to does the supreme court of the United States vary the doctrine laid down in Gibbons v. Ogden [supra], but, by repeated declarations in discussing the various questions presented, affirm the views which I have quoted from that case. Considerable importance was attached in the argument of this case to Allen v. Newberry, 21 How. [62 U. S.] 244, by the counsel for the defense, but I am unable to discover that it is authority against the views which I have expressed. The steamer Fashion was engaged in a general carrying business between ports in different states, and at the time was on a voyage from Two Rivers, in Wisconsin, to Chicago, in Illinois. She was libelled for goods lost on the voyage, which had been shipped on her from Two Rivers to Milwaukee, in the same state. The court held there was no jurisdiction, because the shipment of the particular goods was between ports and places in the same state, and therefore not commerce among the states. In speaking of the act of 1845 [5 Stat. 726], the court says: "There is some ground for saying, upon the words of the act of 1845, that the contracts over which the jurisdiction (in admiralty) is conferred are contracts of shipments with a vessel engaged in the business of commerce between the ports of different states, but the court is of opinion that this is not the true construction and import of the act. On the contrary, that the contracts mentioned relate to the goods carried as well as to the vessel, and that the shipment must be made between ports of different states." Clearly, according to this decision, it is not the fact that the boat does or does not run between places in

different states, which determines the character of the commerce carried, as to whether it be purely domestic or among the states. On the contrary, it is whether the shipment "be made between ports of different states;" when this is the case, the vessel carrying that commerce is to be regarded as employed in commerce among the states. How can it be said that a transhipment at the border of the state, into or from which the commodity is shipped, affects the subject of the commerce, and changes that which was commerce among the states to a purely domestic commerce?

When a commodity has commenced to move, as an article of trade or traffic, between a place in one state and a place in another state, it denotes commerce between the states, and the means employed in moving it from place to place, over every part of the entire line, is an employment in that commerce; and it seems to me that a law of congress which regulates in any respect the means used in the transportation of that commodity is an exercise of the power to regulate commerce among the states, within the constitution. It is wholly inadmissible to say that so far as merchandise is conveyed within a state it is purely internal, and becomes commerce among the states only when it is carried between states, or from one boundary line to another. If merchandise is taken on board a vessel 100 miles in the interior of a state, and by that vessel is transported without unloading to a point 100 miles in the interior of another state, it involves both navigation and commerce among the states, from the place of shipment to the place of unloading. Is it any the less commerce among the states, on its entire route, simply because conveyed, for the first fifty or one hundred miles, on a navigable river, by a boat navigating only that river, and entirely within the boundary of a state? Is it any the less such commerce because this boat forms a link in a line of boats, though in no way connected, covering the whole route, and that there is a transhipment on the way?

If I am correct in the views taken, it can hardly be successfully claimed that it affects the question by showing that the goods cannot be carried on without transhipment, because of the incapacity of the river boat to navigate the lakes—nor vice versa, because the lake boat cannot find a depth of water in the river for her to navigate. The solution of the question lies deeper, and compels us to determine from the subject and the traffic if it be commerce among the states at the time the Ball transported the commodity. Nevertheless, as the question of jurisdiction in this class of cases is of considerable importance, and a decision by this court adverse to that given in The Queen and The Pontiac would not be authoritative out of this district and would result in a want of uniformity in the two districts of this state as to the

liability of boat owners, and inasmuch as I am informed that some of the other judges of the district courts, having jurisdiction bordering the lakes and on the navigable waters emptying into the lakes, entertain opinions in harmony with those expressed by Judge Wilkins in The Forest Queen and The Pontiac, it may be advisable to dismiss the libel in this case, for the sake of uniformity of decisions, if for no other reason.

Certainly, one rule, in reference to what classes of boats come within the inspection and license laws, should prevail in all the districts. Besides, the great experience and learning of Judge Wilkins, and of the other judges who are said to hold views in harmony with his on this subject, I may well acknowledge and allow to govern my action in this case, after having given expression to some of the reasons which would control my decision in the absence of such previous rulings.

There is a further consideration which is of weight in determining the course I should pursue, in justice to the owners of the steamers running on the internal waters of the state within this district, viz.: The government has for more than ten years rested apparently contented with the decision in The Forest Queen and The Pontiac, never having taken an appeal to the circuit court. Boat owners had a right to suppose, therefore, that the United States acquiesced in the view of a want of liability on the part of owners in this class of cases. I am disposed, therefore, contrary to my own judgment upon the law of the case, for the sake of that uniformity which is desirable in the rulings of the district courts, to dismiss the libel, treating the question as within the rule of stare decisis, and to leave it for the United States to appeal to the circuit court, if not content. Libel dismissed.

NOTE [from original report]. On appeal, the supreme court reversed this decree, adopting the reasoning, but not the conclusion, of the district judge. See 10 Wall. [77 U. S.] 557.